The STATE of Ohio, Appellee,

v.

THOMAS, Appellant.

[Cite as State v. Thomas, 170 Ohio App.3d 727, 2007-Ohio-1344.]

Court of Appeals of Ohio,<br>Second District, Greene County.

No. 05–CA–128.

Decided March 23, 2007.

728

Stephen K. Haller, Greene County Prosecuting Attorney, and Elizabeth A. Ellis, Assistant Prosecuting Attorney, for appellee.

Alan Gabel, for appellant.

Donovan, Judge.

{¶ 1} This matter is before the court on the notice of appeal of Martina Thomas, filed October 26, 2005. On April 11, 2003, Thomas was indicted on one count of murder, in violation of R.C. 2903.02(A) and/or (B), and one count of voluntary manslaughter, in violation of R.C. 2903.02(A). On April 22, 2003, Thomas entered a plea of not guilty by reason of insanity. On March 31, 2003, Thomas stabbed her neighbor, Deana Bryant, with a butcher knife, causing her death. On April 2, 2004, the trial court determined that Thomas was not competent to stand trial and ordered that she be hospitalized. On August 19, 2004, the trial court found Thomas to be competent to stand trial and ordered that she remain hospitalized to maintain her competency. On September 8, 2004, Thomas filed a motion to suppress. On April 26, 2005, the trial court again found Thomas to be incompetent to stand trial and ordered that she remain hospitalized. On September 22, 2005, Thomas was again found competent to stand trial, and the trial court overruled in part and sustained in part her motion to suppress. Following a jury trial, Thomas was found not guilty of murder and guilty of voluntary manslaughter. The trial court sentenced Thomas to a ten-year term at the Ohio Reformatory for Women and ordered her to pay restitution in the amount of $9,800.42.

{¶ 2} At the time of the offense, Thomas resided in an apartment complex for the mentally ill at 890 Bickett Road in Xenia, Ohio. Thomas, a paranoid schizophrenic, experienced ongoing conflicts with her neighbors there, including Deana Bryant and her husband, Chris. When the Bryants returned home with their daughter, Kristen, around 10:00 p.m. on March 31, 2003, Thomas, whose apartment was above the Bryants', was playing her music loudly. Thomas had visitors at the time. Chris tapped on the wall, as he had in the past when Thomas's music was too loud. Thomas stomped on the floor above in response. Deana then turned up their radio to try to drown out Thomas's music. Kristen went to bed with her dog, Logan, and Chris went into his bedroom.

{¶ 3} Chris then heard knocking on their apartment door, and he heard Deana open the door. Thomas and one of her guests, Carolyn Taulbee, confronted Deana and an argument ensued. Chris returned from the bedroom and tried to settle the dispute. The Bryants' next door neighbor, Tonya McKelley, who heard the commotion, opened her door to see what was happening. Thomas refused to turn her music down, and Chris asked McKelley to call the police. Thomas then stated, "I got something for your ass," and she ran upstairs.

{¶ 4} Chris returned to his bedroom to retrieve his baseball bat with which to defend his wife and himself. Kristen emerged from her room, carrying Logan. The door to the apartment was closed, and when Chris opened it, he observed

Thomas pulling a butcher knife out of Deana's chest and drawing back to stab her again. Chris swung his bat, knocking the knife from Thomas's hand. He then knocked the knife into his apartment to keep it from Thomas. Chris carried Deana into their apartment and told Kristen to get a towel so he could attempt to stop the profuse bleeding from Deana's wound. Thomas went back to her apartment. When Kristen put Logan down, he ran to Deana, and then the dog exited the apartment. McKelley retrieved the dog and took it and Kristen to her apartment.

{¶ 5} Thomas called 911 and reported that she had been attacked by the Bryants' dog and beaten with a baseball bat. There was no evidence that Thomas had sustained any injuries consistent with dog bites or blows from a bat.

{¶ 6} The record reveals Thomas's lengthy history of mental illness. Thomas's mother was also a paranoid schizophrenic. Thomas witnessed many acts of domestic violence against her mother before the age of five, at which time Thomas was sent to live with a maternal aunt. Thomas was abused while in her aunt's care, and she believed her aunt to be Satan. Thomas began having suicidal thoughts when she was ten. When she was 13, Thomas had her first psychiatric hospitalization, at which time she gave birth to a child who was taken from her. Thomas was released from the hospital at the age of 16, and she immediately married so that she would not have to return to her aunt. Thomas's marriage failed, she remarried again, that marriage also failed, and she had a total of four children. Thomas has had a long-term delusion that she can look into people's eyes and see if there are demons inside them.

{¶ 7} Dr. Franklin Halley, Thomas's treating psychiatrist, testified that Thomas "was not the most reliable person with medication." It was typical for her to stop taking her psychiatric medication on weekends when she knew she was going to consume alcohol and then resume her medication during the week. Thomas is blind in her right eye, the result of an assault and beating in 1997. Heather Stevens, Thomas's case manager, recommended that Thomas be moved from the Xenia apartment complex, "[b]ecause I know that she was scared of the neighbor's dog, and she kept a knife in her door, and she had stated on several occasions that she felt like hitting [the neighbors]." Dr. Bobbi Hopes, who evaluated Thomas for competency and sanity, testified that Thomas "has been diagnosed with paranoid schizophrenia throughout her life. This has been a fairly consistent diagnosis. And, in fact, her treatment records indicate repeatedly phrases like ongoing paranoia, ongoing delusions, chronic hallucinations. Even when she takes her medicine. * * * So her records will talk about her doing better and being improved, but they're not talking about her ever not being mentally ill. Even when she is at best, she still has delusions and they

particularly focus on evil and seeing demons, and looking into people's eyes and knowing that they have demons."

{¶ 8} Thomas asserts seven assignments of error.

{¶ 9} We begin our analysis with Thomas's second assignment of error, which is as follows:

{¶ 10} "The trial court erred in failing to suppress involuntary statements gained against appellant in violation of her constitutional rights."

{¶ 11} Thomas moved to suppress statements she made to any law enforcement personnel, arguing that they were involuntary and given in violation of her constitutional rights. There is not a transcript of the hearing on the motion to suppress in the record. "The duty to provide a transcript for appellate review falls upon the appellant. * * * An appellant bears the burden of showing prejudicial error by reference to matters in the record." *Shirley v. Kruse*, Greene App. No. 2006–CA–12, 2007-Ohio-193, 2007 WL 127697, ¶ 22. "When portions of the transcript necessary for resolution of assigned errors are omitted from the record, we have nothing to pass upon and, thus, we have no choice but to presume the validity of the lower court's proceedings and affirm." Id.

{¶ 12} Presuming the validity of the lower court's proceedings on Thomas's motion to suppress, Thomas's second assignment of error is overruled.

{¶ 13} We next address Thomas's sixth assignment of error, which is as follows:

{¶ 14} "Appellant was deprived of due process and a fair trial through the presentation of faulty or incomplete jury instructions."

{¶ 15} " 'The jury instructions given by a trial court must be a correct, clear, and complete statement of the law applicable to the case.' " *McBride v. Quebe*, Montgomery App. No. 21310, 2006-Ohio-5128, 2006 WL 2795174, ¶ 50, quoting *Roberts v. State Farm Mut. Auto. Ins. Co.*, 155 Ohio App.3d 535, 2003-Ohio-5398, 802 N.E.2d 157, at ¶ 48. "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A). Failure to object waives all but plain error. *McBride*. Plain error exists "if the trial outcome would clearly have been different, absent the alleged error in the trial court proceedings." *State v. Rollins*, Clark App. No. 2005–CA–10, 2006-Ohio-5399, 2006 WL 2942123. "[T]o successfully prevail under plain error the substantial rights of the accused must be so adversely affected that the error undermines the 'fairness of the guilt determining process.' " *State v. Ohl* (Nov. 27, 1991), Ashland App. No. CA–976,

1991 WL 274508, quoting *State v. Gideons* (1977) 52 Ohio App.2d 70, 6 O.O.3d 50, 368 N.E.2d 67.

{¶ 16} Plain error is demonstrated when a "manifest miscarriage of justice" results from an improper jury instruction. *State v. Recker*, Putnam App. Nos. 12–05–21 and 12–05–22, 2007-Ohio-216, 2007 WL 136307, ¶ 11. "In a criminal case it is not error to refuse a requested instruction covered in the general charge." *State v. Henley* (1968), 15 Ohio St.2d 86, 90, 44 O.O.2d 61, 238 N.E.2d 773.

{¶ 17} Thomas argues that the following jury instructions were improper: "The Defendant must be acquitted by reason of insanity unless the State produces evidence which convinces you, beyond a reasonable doubt, of each and every element that has been charged in the indictment, and the Defendant establishes, by a preponderance of the evidence, that the Defendant was insane at the time of the offense." Thomas did not object to the instruction when it was given. Thomas argues that a "plain reading of this instruction directs jurors to find Martina Thomas guilty if the Defense established she was insane."

{¶ 18} In response, the state argues that "the majority of the jury instructions on this issue instruct the jury properly and in accordance with the law, so therefore, the Defendant cannot demonstrate that but for the instruction of which the Defendant now complains, the result of the trial would have been different."

{¶ 19} The trial court did later instruct the jury, consistent with 4 Ohio Jury Instructions (2006), Section 411.51, as follows: "The plea of not guilty by reason of insanity raises the issue of insanity of the Defendant at the time of the commission of the act. To establish the defense of insanity, the Defendant must prove, by a preponderance of the evidence, that at the time of the offense, she did not know, as a result of a severe mental illness or defect, the wrongfulness of her act."

{¶ 20} The initial and latter instructions given by the trial court are in clear conflict with each other, and the conflict was never resolved. The initial instruction dictated that the jury find Thomas guilty even if Thomas proved the elements of the defense of insanity by a preponderance of the evidence. Given the strength of the insanity defense and the failure to correct both the erroneous written and oral instructions, the conflicting instructions could not have done other than mislead the jury and could have led to a manifest miscarriage of justice. The clearly conflicting instructions made it impossible for the jury to properly consider Thomas's affirmative defense of insanity. Accordingly, Thomas's substantial right to present a viable affirmative defense was undermined. We believe the jury instructions taken as a whole do not sufficiently inform the jury that if Thomas established insanity by the greater weight of the evidence,

she was entitled to a not-guilty finding. In fact, the first instruction suggests that if Thomas met her burden she should be found guilty, but insane. Although the trial court later gave a proper instruction, it did not cure the improper one. The error is exacerbated by the fact that the jury had both instructions in writing with them in the jury room. Since the "fairness of the guilt determining process" was so adversely affected, we conclude that Thomas has demonstrated plain error.

{¶ 21} Thomas next argues that the following jury instruction was improper: "You must consider the conduct of Deana Bryant and the sight of her acts and words caused Martina Thomas to reasonably and honestly believe that she was about to be killed or receive great bodily harm." Thomas argues that the following instruction "makes little sense and deprives Defendant of the benefit of the effect of this jury instruction."

{¶ 22} The state argues that the error in the second instruction is merely scrivener's error and that the jury was properly instructed. See Ohio Jury Instruction (2006), Section 411.35 ("You must consider the conduct of [Deana Bryant] and decide whether her acts and words caused the defendant reasonably and honestly to believe that she was about to be killed or receive great bodily harm.") The set of jury instructions that are a part of Thomas's file and that were in the jury room with the jurors provides, "You must consider the conduct of Deana Bryant and decide if her acts and words caused Martina Thomas to reasonably and honestly believe that she was about to be killed or receive great bodily harm." We agree that merely scrivener's error exists in the transcript.

{¶ 23} Counsel for Thomas, without explanation, next argues that "the videotape referred to in the jury instructions was never properly authenticated. The Trial Court's instruction pertaining to it leaves it up to the jury to consider whether videotape was a true record of what transpired, without sufficient authentication testimony." Thomas introduced the videotape as follows: "At this time, Your Honor, we would like to play the tape, let Dr. Dyer review. This is Defendant's Exhibit XXX, which is purported to be the tape of my client sitting in the cruiser, which was furnished to her by the Prosecutor's Office." The prosecutor then remarked that "the State would stipulate two things: Number 1, that the tape represents the Defendant as she is sitting in the cruiser, and would state that if she is sitting in the cruiser, immediately following being brought down from her apartment, after the killing occurred, Number 1. And, Number 2, that the State would stipulate that the tape accurately represents what it purports to represent, that being the Defendant making statements as the camera is pointing out to the front of the cruiser, where you cannot actually see the Defendant."

{¶ 24} Counsel for Thomas then stated, "Your Honor, Number 1, I'm just asking Dr. Dyer to look at it and see if it's the tape she reviewed. Number 2, I will not agree that it was immediately after because Mr. Hunter and I don't know that. So that would be a guess on his part and mine. And 3 is, I just want her to tell me if it's a tape, as far as what is on there, I think it starts with the police arriving to the scene; they're going to the scene, and then, at some point, Martina is put in the back of the cruiser. I think it is right after that."

{¶ 25} Thomas did not object to the instruction about which she complains, and there is no plain error.

{¶ 26} Finally, Thomas argues that the trial court "erred in refusing to provide the jury with a requested instruction regarding temporary insanity, as evidence in the case supported that instruction." Counsel for Thomas requested that the following language be included in the instruction on insanity: "Insanity may be of a short or of a long duration. The test for sanity remains the same, irrespective of its duration. Whether a form of temporary insanity exists in this case is a question for you to decide." Since we have already found plain error in the instruction on insanity, we need not address this argument.

{¶ 27} Having found plain error in the trial court's conflicting instructions on Thomas's insanity defense, Thomas's sixth assignment of error is sustained in part. Our resolution of the sixth assignment of error renders moot Thomas's remaining assignments of error, as plain error dictates that we remand the matter for a new trial. (Thomas's remaining assignments of error argue that her conviction was against the manifest weight and the sufficiency of the evidence, prosecutorial misconduct, ineffective assistance of counsel, "deprivation of re-quested discovery materials and the trial court's inaccurate rulings," and for resentencing pursuant to *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.)

{¶ 28} We feel compelled to further note the trial court's erroneous instruction on voluntary manslaughter, to which Thomas did not object nor assign as error herein. The trial court instructed the jury as follows: "Before you can find the Defendant guilty of voluntary manslaughter, you must find that on or about the 31st day of March, 2003, and in Greene County, Ohio, Martina Thomas, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another." This instruction suggests that the state bore the burden of establishing sudden passion or a sudden fit of rage by proof beyond a reasonable doubt. Sudden passion or a sudden fit of rage occasioned by the victim, however, are circumstances that mitigate culpability, and they are not elements of the crime of voluntary manslaughter. *State v. Muscatello* (1978), 55

Ohio St.2d 201, 9 O.O.3d 148, 378 N.E.2d 738. Since Thomas was convicted of voluntary manslaughter and not murder, however, she suffered no prejudice from the improper instruction. We note this error, however, to alert counsel and the court to the proper instruction when dealing with an inferior degree offense such as manslaughter.

Judgment reversed
and cause remanded.

BROGAN and FAIN, JJ., concur.